NOT DESIGNATED FOR PUBLICATION

No. 128,946

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of E.M., a Minor Child.

MEMORANDUM OPINION

Appeal from Cherokee District Court; DOUGLAS STEELE, magistrate judge. Submitted without oral argument. Opinion filed December 19, 2025. Affirmed and remanded with directions.

*Jacob A. Conard*, of Columbus, for appellant natural father.

*Addison A. Tucker*, assistant county attorney, and *Kurt C. Benecke*, county attorney, for appellee.

Before GARDNER, P.J., HILL, J., and JOAN M. LOWDON, District Judge, assigned.

PER CURIAM: Raising three arguments, the father of E.M., a minor child born in 2012, appeals a district court's finding that the boy is a child in need of care. Father first argues that the statutes defining a child in need of care found in K.S.A. 38-2202(d)(1)-(3) are unconstitutionally vague. In his view, the three sections fail to give sufficient warning of what conduct is prohibited, and they fail to adequately guard against arbitrary enforcement. Next, Father contends that an amendment to the State's petition made before the hearing deprived him of due process. Finally, he argues that the evidence presented here is not clear and convincing that E.M. is a child in need of care. He suggests that even when we review all the evidence in a light most favorable to the State, a rational fact-finder could not have found it highly probable that E.M. was a child in need of care.

1

*A kind neighbor found E.M. by the side of the road, and his case begins.*

E.M. is the oldest son of Mother and Father, and he lived with his parents in Cherokee County, Kansas, until this case started.

One afternoon, Brittney Emanuel noticed a child sitting on the asphalt beside the road. Emanuel lived a few houses down from the house where the child was sitting. Emanuel recognized the child as E.M., who rode the same school bus as Emanuel's chldren. After a while, Emanuel saw that E.M. was still sitting on the road and appeared hot, sweaty, and a little sunburnt. She testified that the temperature that afternoon reached the mid-90s.

Emanuel approached E.M. and asked if he was okay. He said he was really upset because he and his mom were arguing and he said he could not go inside his house. Emanuel invited E.M. in to her house where she gave him some snacks and cold water.

Since finding E.M. sitting on the side of the road, Emanuel recalled that about an hour and a half had passed before she called law enforcement. E.M. was with Emanuel for approximately two hours. In those two hours, Emanuel testified that no adult came looking for him.

When a Deputy arrived, he learned from Emanuel that she saw E.M. on the side of the road and that, when she checked on him, E.M. said he was locked out of his house and needed a glass of water. When the Deputy spoke to E.M., he appeared upset and said he was locked out of his house. The Deputy then went to E.M.'s house and spoke with his mother.

Mother told the Deputy that E.M. was supposed to do Bible study homework but that he did not want to do it, so she told him that he couldn't come back inside until he did

2

the homework. Mother said that she would let E.M. back inside if he did the homework and stayed in his bedroom. The Deputy asked what the next steps should be, so Mother called Father, who was at work. Ultimately, Mother and Father said they wanted the Deputy to take their son to the Sheriff's Office and call juvenile intake.

The State filed a child in need of care petition, alleging E.M. was without the care or control necessary for his physical, mental, or emotional health, as defined by K.S.A. 38-2202(d)(2). In due course, the case was set for a temporary custody hearing. Because that testimony was used by incorporation later at the adjudication hearing, we report some of the details of that evidence.

*Mother's testimony at the temporary custody hearing reveals conflict.*

Mother testified that she has been a part of E.M.'s life since he was five years old. She stated that she adopted E.M. in March 2024.

When asked about the events on September 16, 2024, when he was found by the road, Mother testified that she assigned a religious assignment to teach E.M. how to treat friends and family better. But Mother testified that E.M. did not want to do the assignment, so she gave E.M. the choice to either come inside the house, sit on his bed, and do the assignment or that if E.M. wanted to "disrespect us then [E.M.] can—if [he's] unhappy [he] can go." Mother told E.M. that she did not care if he went to his grandpa's, testifying "I did not care where he went."

Mother testified that E.M. chose to stand at the property line but later testified that she had walked him to the property line. She recalled that E.M. was not sure where he could go and Mother told him "wherever makes you happy." While E.M. was standing outside, Mother testified that she was sitting inside her Jeep to keep an eye on E.M. But

3

she stated that he did not know she was there. The only other adult present at the home was Grandfather—but just briefly while he was fixing something inside the house.

Mother later testified that almost immediately after E.M. went outside, she left. She stated that Grandfather was left to watch E.M. while Mother went for a drive to regain her composure because she was upset after arguing with E.M. When she returned, Mother testified that she passed Grandfather leaving the neighborhood. She estimated that she had been gone 10-15 minutes. Mother later testified that E.M. was away from the home for about two hours.

E.M. was not outside when she returned and Grandfather told Mother that he saw E.M. walking towards Emanuel's house. Mother said that she was not familiar with Emanuel, stating that she was told Emanuel might have a foster child in her home. Given that she might have a foster child, Mother figured Emanuel's house "was probably an okay place for [E.M.] to be and calm down."

E.M. returned to his home at some point and Mother testified that she was sitting in her Jeep and that E.M. was yelling at her. She rolled her window down and recalled that E.M. said he needs his backpack, football gear, and his clothes. Mother told E.M. that if he wanted those things then he had to go sit on his bed. E.M. said he would not do that, so Mother said he chose to go back to Emanuel's house.

Sometime after E.M. went back to Emanuel's house, Mother talked with law enforcement. She testified that she told the Deputy that E.M. was beyond her control. She stated E.M. was beyond her control after her experience with a DCF case in Colorado "that was very similar to this." She believed that if she said her child was beyond her control, she would receive psychiatric services for her child.

4

Mother testified that E.M. was welcome in her home and that she wanted him to return home. She also acknowledged that E.M. needs mental health services and that she was willing to provide those services.

Father also testified at the hearing, but he mostly repeated the same testimony as Mother. Father said that E.M. is welcome in his home and that he wanted E.M. to come back home. He testified he was willing to provide whatever mental health services or treatment that E.M. needs if he comes home.

*The district court granted temporary custody of E.M. to the Department.*

The district court found that there was probable cause to believe that the welfare of E.M. would be endangered if he were returned home. It found that E.M. was experiencing a mental health crisis and that temporary custody with DCF was the best option for E.M.'s welfare. The court also gave DCF the discretion to return E.M. home should the agency decide he may go home. It ordered the family to participate in mental health therapy, both individually and as a family. The court also ordered Mother and Father to take parenting classes.

*In due course, the court considers whether E.M. is a child in need of care.*

Before the adjudication hearing, the State amended its petition to include two additional statutory grounds for the court to find E.M. a child in need of care. The additional grounds alleged:

(1) E.M. was without adequate parental care, control, or subsistence and it was not due solely to the lack of his parents' financial means, as defined by K.S.A. 38-2202(d)(1); and

(2) that E.M. had been physically, mentally, or emotionally abused or neglected or sexually abused, as defined by K.S.A. 38-2202(d)(3).

Father objected to the amended petition, arguing that the timing of the amendment—nine days before the adjudication hearing—was prejudicial to Father and that the amended allegations were substantively distinct from the original pleading. Father also argued that allowing the State to proceed on the amended petition deprived him of an opportunity to fully prepare for the adjudication hearing.

At the adjudication hearing, the district court heard both parties' arguments and found that "the State can amend the petition almost at will." The court allowed the State to proceed on the amended petition but stated that *if after taking a brief recess, the parties needed more time to prepare, the court would continue the adjudication hearing to allow more time to prepare.* The adjudication hearing proceeded without any requests for a continuance—notably, both Father and Mother told the court they were ready to proceed.

*Reintegration of this family was challenging due to hostility.*

The State presented testimony from two staff members from The Family Institute, who were assigned to work with E.M. and Mother and Father to reintegrate the family. Lori Edwards, the permanency support worker at the Institute, was assigned to E.M.'s case and testified about the difficulty in trying to reintegrate the family. At the outset, she struggled to establish a good relationship with Mother and Father. She testified that she had difficulty creating a case plan, largely due to Father's refusal to consent or sign the case plan.

The case plan had several objectives and goals that were aimed at facilitating reintegration of E.M.'s family. Some of those objectives included court-ordered tasks for

Mother and Father: (1) both parents had to complete at least 30 hours of parenting classes, (2) complete mental intake and follow all recommendations, and (3) engage in family therapy.

Both E.M. and his parents felt family therapy was not going well. E.M. was often upset after a session, reporting that he worries and stresses about family therapy sessions. Edwards testified that E.M. was participating in individual therapy and that she saw progress from E.M. Edwards said she had not yet received confirmation that parents were participating in individual therapy as ordered.

To facilitate reintegration, the Institute staff supervised weekly visits with E.M. and his parents. But several of these visits ended early "due to verbal aggression" from both parents. E.M. asked that visits end early occasionally because he felt attacked or felt the conversation was not going in a positive way. In the four months since the temporary custody hearing, E.M. and his parents completed only one weekly visitation. During the visit, Edwards had to redirect Mother and Father and E.M. multiple times to keep the conversation positive. Towards the end of the visit, Edwards testified that Father commented that "TFI Stole Christmas." Other visits had been canceled, but only one was due to inclement weather and not canceled or terminated early due to the parents' comments. She stated the other visits lasted a mere four to six minutes "due to verbal aggression from parents."

Edwards testified that Mother and Father's hostile language and verbal aggression directed mainly at the Institute staff made reintegration difficult. She also testified that E.M. was present and heard some verbal aggression and negative comments from Mother and Father. Edwards testified that E.M. expressed that their comments bothered and upset him.

Edwards believed that E.M. was putting more effort into the case plan than his parents and stated she felt the parents had not put equal effort in the plan. Edwards said that she could not in a meaningful way address the concerns of emotional abuse that had brought this case to court. She attributed this to parents' verbal aggression, their personal attacks on the case team, difficulties cooperating with parents, and having poor lines of communication mainly because of parents' verbal aggression.

Cayley Bole, the permanency director at The Family Institute, also testified about the agency's efforts to reintegrate E.M. with his parents. Bole testified that Mother and Father's email to the agency tended "to be pretty verbally aggressive towards staff." Bole testified that the agency attempted to arrange a third-party supervisor after Mother and Father refused to meet with the agency's staff over personal disagreements.

*Mother offers two views of E.M.: one in court and one in social media.*

Mother testified that she had never locked E.M. out of the house. When she removed E.M. from the house and took him to the property line for refusing to do the assigned religious homework, Mother said E.M. could return to the house if he was willing to follow the rules of their home. Mother did agree that E.M.'s welcome in her home was conditional. She testified that "[she] said it that day and [she'll] say it again, that day [E.M.] was beyond [her] control."

Mother admitted to posting about 20-25 TikTok videos about E.M. and the case. TikTok is a social media app where users post short videos that are generally viewable by anyone with the TikTok app. Some of the TikTok videos discussed E.M.'s hospitalizations and behavioral issues, and Mother stated that E.M. was beyond her control. In one of her TikTok videos, Mother admitted that she referred to E.M. as a "fucking asshole" and a "vindictive liar."

8

Mother also testified that she was not satisfied with family therapy because there was nothing in place for E.M. to be held accountable. She also expressed frustration with E.M.'s current foster placement because she believed that E.M.'s foster mom was overstepping boundaries by taking him to be baptized and vaccinating E.M. She testified that the only solution to resuming visitations would be to "unvaccinate" and "unbaptize" E.M.

*Father expresses a willingness to seek help for E.M.*

Finally, Father also testified at the hearing, stating that he wants E.M. to return home and that he believes he can provide the mental health services and treatment that E.M. needs.

Then the court, upon request, took judicial notice of the testimony presented at the temporary custody hearing.

The district court found E.M. was a child in need of care under all three statutory factors. Without making any findings or specifying any particular evidence, the court stated that the evidence showed that E.M. was without parental control or care and that E.M. was without care for his emotional health, thus meeting the statutory bases provided in K.S.A. 38-2202(d)(1)-(2). The court added that E.M. had suffered emotional abuse at least in part due to Mother and Father's parenting. This, in the court's view, met the last statutory basis under K.S.A. 38-2202(d)(3). Again, the court made no specific findings and did not specify what evidence led to its conclusion.

Only Father appeals the ruling that E.M. is a child in need of care.

*Precedent directs that these three statutes are not unconstitutionally vague.*

Father argues that K.S.A. 38-2202(d)(1)-(3) are unconstitutionally vague because they "fail to give sufficient warning of the prohibited conduct under common understanding." Father's argument repeatedly emphasizes the subjective nature of parenting decisions and arbitrary authority afforded to judges to make judgments of these subjective parenting decisions. Father claims a person of common intelligence would be unable to discern conduct that is proscribed under the statute based on broad definitions of emotional abuse or lack of parental care, control, or subsistence.

Further, Father finds that the statutes fail to provide any safeguard against arbitrary enforcement, claiming the entire adjudication process arbitrarily subverts the constitutionally protected parent-child relationship by "an individual judge's own subjective biases, life experience, norms and taboo matrices, and socio-economic expectations."

The State argues that the Supreme Court has already considered whether K.S.A. 38-2202(d)(2) is unconstitutionally vague and found the statute to be fundamentally unambiguous. Given the similarity of that subsection to subsections (d)(1) and (d)(3), the same reasoning should apply as all three subsections are clear and unambiguous.

This court follows Supreme Court precedent. The statute is not ambiguous and therefore no inquiry into statutory construction needs to be taken because the statute is unambiguous on its face. *In re F.C.*, 313 Kan. 31, 37-38, 482 P.3d 1137 (2021).

As the Supreme Court found, each of the 14 specific categories under subsection (d) provides its own temporal scope for which facts are relevant to establish a child is in need of care. *In re F.C.*, 313 Kan. at 37-38. Because the plain language provides that subsection (d)(1) and (d)(2) are set in the present tense, the relevant facts would be

10

related to the child's circumstances at the time of the adjudication hearing. K.S.A. 38-2202(d)(1)-(2). And in subsection (d)(3), the plain language of the statute is framed in the present perfect tense. K.S.A. 38-2202(d)(3). This means that to find a child is in need of care under subsection (d)(3), the court must make its determination based on evidence of abuse or neglect that occurred in the past and the present. *In re T.C.R.*, No. 127,184, 2024 WL 4182302, at *4 (Kan. App. 2024) (unpublished opinion).

Because the statutory language is clear, we find that K.S.A. 38-2202(d)(1)-(3) is not unconstitutional.

*We see no due process violation by the State's amendment to its petition.*

Father contends that his due process rights were violated by the State's amended petition. He claims that the amended petition was filed days before the adjudication and included a new allegation of abuse or neglect which deprived Father's due process rights to be heard in a meaningful way. He argues that the new allegation expanded the temporal scope of the adjudication proceeding and therefore, Father says he was not afforded a right to be heard in a meaningful way before being deprived of his constitutional right to parent his child.

The State takes a contrary position.

We are guided by prior cases. The Revised Kansas Code for Care of Children allows the State to amend its petition with the discretion left to the district court to decide whether the State may proceed on an amended petition for adjudication. See *In re A.M.D.*, No. 117,320, 2017 WL 3001352, at *5-6 (Kan. App. 2017) (unpublished opinion).

11

The district court heard both parties' arguments related to the State's proposed amended petition and decided to allow the amendment. The court also allowed Father to take a short recess to decide whether they were ready to proceed. The court informed the parties that it would entertain a motion to continue. All parties returned after the recess and affirmed that they were ready to proceed.

Thus, Father was not deprived of due process rights as he was given notice of the amendment and the opportunity to be meaningfully heard in his opposition of the amended petition. Accordingly, we affirm the district court's decision to allow the State to proceed with the amended petition.

*We cannot properly review the trial court's holding.*

Father contends the State failed to prove E.M. is a child in need of care by clear and convincing evidence. The State contends it did. The statutes and cases guide us.

Under the Revised Kansas Code for Care of Children, a "child in need of care" is defined as "a person less than 18 years of age at the time of filing of the petition" who meets any of the 14 criterion listed under the statute. K.S.A. 38-2202(d). Relevant here, a court may find a child in need of care when the child

> "(1) is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian;
> "(2) is without the care or control necessary for the child's physical, mental or emotional health; [or]
> "(3) has been physically, mentally or emotionally abused or neglected or sexually abused." K.S.A. 38-2202(d)(1)-(3).

Physical, mental, or emotional abuse, as referred to by the third condition above, is defined under the statute as "the infliction of physical, mental or emotional harm or the

12

causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered." K.S.A. 38-2202(ee).

The State need only prove a single statutory ground to support a CINC adjudication. See *In re F.C.*, 313 Kan. at 44.

The burden of proof borne by the State at a CINC adjudication is proof by clear and convincing evidence that the child is in need of care. K.S.A. 38-2250. "Clear and convincing evidence is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." *Pyle v. Gall*, 317 Kan. 499, 501, 531 P.3d 1189 (2023). When reviewing a claim that requires proof by clear and convincing evidence, an appellate court reviews all evidence in the light most favorable to the prevailing party to determine whether a rational factfinder could have deemed the findings highly probable. In making this determination, an appellate court will "not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

We find that we cannot properly review this issue because the trial court did not identify what evidence it was relying on when it reached several conclusions. We cannot substitute our findings for a trial court.

Appellate review of a trial will never serve as a substitute for a trial. We see no witnesses. We cannot tell if there is a note of certainty in their voices. We cannot observe the parties' reactions to the evidence as it is admitted. We cannot see them sweat.

Instead, we read words on a screen or a page. We read arguments of counsel. We consider precedent. At times, we engage in Socratic dialogue with counsel concerning the

13

law. We do not find facts. Finding the facts is the mission of the trial court. The trial court here failed in that mission.

"Without an objection, this court will presume the district court made all the necessary factual findings to support its judgment, though this court may consider a remand if the lack of specific findings precludes meaningful appellate review." *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, Syl. ¶ 14, 509 P.3d 1211 (2022). Therefore, we must remand this case to the district court for clarification of what its findings are and upon what evidence it bases its conclusions. We will not set aside the court's holding that E.M. is a child in need of care at this point. The court can continue to supervise the case.

Affirmed and remanded with directions.